First case, In Re Fosomax Products Liability Litigation. Mr. Vogel. Thank you and may it please the court. I would ask to reserve three minutes for rebuttal here this morning. Okay, done. The Supreme Court's decisions in Mincing and in Bartlett do not serve to preempt plaintiff's design defect claims asserted against the generic defense in this case. I hate to stop you right in your first sentence, but I've got to ask a question about jurisdiction. I have been, and perhaps I should have asked for 28 days on this before, but can you help me understand how we got jurisdiction in this case? You say in your opening, in your brief, when you talk about how this comes to be that the generic defendants were treated this way and the generic defendants were treated that way. And that sort of implies that there are some defendants who aren't generic defendants like Merck who are maybe still in the case. Now I've got to believe that able counsel on both sides here must have figured out this thing was final before bringing it up. But it's hard for me to decipher that from the court's order or from anything you guys have said. So how did we get to a final, final order in this case? Yes, Your Honor. Hopefully I can explain that. It is sort of convoluted, but I think I can hopefully get you there. There are branded, the branded defendant Merck is a part of this litigation. And there are many generic defendants, I think somewhere in the range of 10 or 11, which are all subject to this appeal here. Initially, the District Court of New Jersey decided the preemption motion. And it's my reading of the orders from 11-21-11 from Judge Brown and then later from 4-3-20-12 from Judge Pisano that those are final orders dismissing the all of generic defendants from this litigation. Okay. So dismissing all generic defendants. But what's up with Merck? Merck is still in the case? Merck is still in the case, Your Honor. Yes. Okay. If Merck is still in the case and there's a claim against Merck, then how is there a general order ruling, which I searched in vain for in the record? And none was filed, to my knowledge, Your Honor. I don't believe one was filed. Well, if there's still a live claim against one defendant, how is this a final, how is there a final order for us to be reviewing here? In reviewing the orders that we had in front of us, given that this was a final resolution of all the generic defendants and there's a common issue there, it was my reading of the jurisprudence that it was appropriate to file this appeal to preserve it as to those generic defendants. I don't understand that because the definition is that you cannot appeal, well, there's exceptions, injunctions, you know, I understand that denial of a motion for qualified immunity, but a case linearly has to be final as to all parties on all issues to be appealable. In this case, isn't. You know what? I know this is a little bit unusual and I'll ask Mr. Matos to stop the clock here for a second, all right? And Mr. Vogel, I'm going to ask Mr. Lefkowitz to come up because it may be that they have an insight on jurisdiction right out of the box too and I just want to hear from them for a moment and then we'll have you back, all right? Certainly, Your Honor. Okay. Can you shed any light on this, Mr. Lefkowitz? Are we here too soon? Your Honor, in candor, I don't think we focused on this. We took the appeal as it came and focused on obviously the substance and the waiver issues. We understood it's a very complicated set of underlying cases which have been all brought together. There are two different orders below and so I think we'd be happy to provide the court with a responsive letter if that's what the court would like to do. Well then, you know, maybe it's unfortunate that we didn't ask because we had, you might have gone to the district court and asked the district court and this happens to enter a Rule 54B motion now. I don't know what I mean. Yeah, we, yeah. I think this was a case where there were big issues and interesting things to deal with and maybe this slipped by all of us which is a problem. It slipped by me until this minute. Slipped by me as well. Well then I don't feel bad that it slipped by me. Usually I love to find no jurisdiction. Yeah. So here's what I'm going to ask the parties to do. And we'll go ahead, you know, we're all set to have a party today so we'll go ahead and throw our party. We'll talk about the cases, we'll talk about the issues, we'll deal with what we can in the way of substance recognizing that the substance of what we deal with here may only be informational to be picked up again at a later point in time. But we will need 28J letters. And if in your own work you discover Merck is still in the case, there's a life claim against them, there's not a final order, you know, we'd urge you to do what you can with the district court to try to tee the thing up for an appropriate appeal. And if you can't do that in short order, we'll see you in a couple years or however long it takes you to make it back here assuming that there is the jurisdictional problem that we've been talking about, okay? It may be that the case is Kate Mae Green versus somebody where they went to the court after an appeal was taken. Only the district court can do that. Yeah. Okay. And we'll see what you all can work out in that respect, all right? Thank you, Your Honor. Mr. Bogle, do you want to come on back? Before we start the clock, can I ask a question? Sure. That's somewhat related. The settlement of the case before Judge Keenan, does that involve all the defendants or just Merck? That is as to the jaw litigation. I know. I know that. I know that. So that resolves just those jaw cases. These are femur cases. I know that. I know that. I'm just wondering, is it as to all defendants or just Merck? Currently just Merck. Okay. Thank you. Currently there's no settlement as to the generic case. Okay. All right. Okay. We're back on the clock. And go ahead with your presentation, Mr. Bogle. Thank you, Your Honor. The Supreme Court's decisions in Mensing and Bartlett do not serve to preempt plaintiff's design defect claims as asserted in the generic defendants in this case. Thus, the district court erred in finding that plaintiff's design defect claims were preempted. And I want to start today with what I believe is the core of the appeal here before you. And that is that the trial court failed to fully and properly consider and analyze plaintiff's design defect claim in the context of the generic defendant's motion for judgment on the pleadings. Well, let me ask you a question that may give some more shape to what you're about to say. I understand Bartlett and Mensing to be saying that except for a misbranding case, which you haven't pled here, unless I'm mistaken. There's not a claim that these things were misbranded. Except for that, no matter how state law on design defect might be framed, there's only three options that would come out at the other end. And those three options are, you change the label, you change the drug, or you pull the drug and stop selling it. Now, am I correct that no matter what form state design defect law might take, those are the three things you come down to? Those are the three duties that can be imposed by some states. And what I've intended to address here today, and I can go ahead and address now, is that there are states that do not impose those affirmative duties, the duties to change or alter labeling, or the duties to alter the product's design, which are specifically addressed in Bartlett and Mensing. And those states apply more of just a general burden-shifting mechanism over to the manufacturers. So there aren't any affirmative duties in those states to do one of the things that you've just described. Well, when you say they shift the burden, it's a burden to do what? What burden is being shifted to the manufacturers? It's a burden to compensate those that have been injured due to the ingestion of the drug at issue. But they can't be required to compensate unless it was shown that they did something wrong or there was strict liability, not absolute liability. And I believe that's addressed specifically in our briefs in the negligent design defect claims, because what is precisely at issue there is the conduct of the manufacturer. And so what Mensing and Bartlett address, and more specifically Bartlett, are design defect claims centering around strict liability. When you're dealing with negligent design defect claims, the very core issue is the conduct of the manufacturer. Sure. It's a breach of a duty. Yeah, it's a breach of a duty. But in the end, assume there's the breach of some – well, okay. I'm trying to understand what the breach of the duty would be. Is it a breach of the duty to change the label because you haven't adequately described the harm? Is it a breach of a duty to design the drug or change the drug to be safer once you find out it's a problem? Because if those are the duties you're talking about, aren't you right back in the middle of Bartlett? Well, in specifically dealing with the negligent design defect claim that I was just talking about, the very core duty at issue is to monitor your drug, study your drug, and remove the drug from the market if you feel that the risk of the drug outweighs. So the breach of the duty is the failure to remove it from the market. Right. And I think that it's different than what the court dealt with in Bartlett in the strict liability sense because what the court was dealing with in Bartlett was that was sort of the mechanism to avoid liability, was to remove the drug from the market. But here that's the affirmative duty that's set in a negligence case, is to remove the drug from the market. So it's the opposite. How does this case differ from the case that was decided by Judge Keenan on a motion to dismiss the Fosamax MDL? The motion in front of Judge Keenan specifically our argument centered around the failure to warn claims. And the arguments were addressed specifically to the failure to timely update a label by a generic manufacturer. He let that one in, but all the other claims he found were preemptive. Right. He did find that in that context that the design defect claims were preemptive. That's correct, Your Honor. And he did find that the failure to update claims, which obviously are not being addressed. We would have to disagree, I take it, with Judge Keenan. In that context, yes, Your Honor, I do. Okay. And I'm struggling a little bit to understand the distinction you're making, so maybe you can help me with it. If at the end of your negligence theory, the answer is stop selling, you've got a problem with your drug, so change the drug or change the label or stop selling, how is that different in any meaningful way from what Bartlett said is preemptive? Because in a negligence context, what's at issue is the reasonableness of the manufacturer in continuing to sell the drug, knowing what it knows about its risks, whereas in strict liability, as was addressed in Bartlett, what you're looking at there is, you know, should you remove the drug to avoid liability when you have no other options? So the issue in a negligence case is that is the very duty that's being imposed, is to remove the drug from the market, whereas it's the opposite in the strict liability context, as they addressed in Bartlett, because that's sort of your escape hatch to avoid liability. Well, I confess that's a subtlety which I guess I'll have to wrestle with a little more because I'm having difficulty grasping it, but how is it that the negligence liability theory is not waived here? You've got, yeah, where did you mention this in your opening brief? In our opening brief, as I recall it in the statement of issues, we framed it as that our design defect claims were not preempted. And so there was no specification in that context as to strict liability and negligence. And if you look at the underlying briefing at the district court level, we did address design defect claims both in the context of strict liability and in negligence. So I certainly could have stated that our strict liability and negligent design defect claims are not preempted, but I think in making the more general statement, it encompasses both. What you said was actually in the summary of arguments, it says the district court erred in dismissing appellant's risk utility-based design defect claims. Now, when I see those words risk utility design defect claims, that tells me we're talking about the strict liability kind of claim, exactly the sort of claim that was at issue in Bartlett. Am I wrong about an understanding that that's what you were saying? In that context, that's what I was referring to. What I was referring the court back to was in the statement of issues, which I believe is on the prior page, where the more general statement that I refer to is made. If you just say design defect and then you don't mention any negligence-based argument in the rest of the briefing, do you think that's sufficient to preserve a negligence-based argument? I believe that there is a discussion of negligence concepts within the opening brief. I would fully acknowledge that the primary focus of that brief was the risk liability theory. I'm not disputing that, Your Honor, but I don't believe that the negligence concept is completely and fully glossed over to the point that it would be waived. Okay. What was their negligence? I'm sorry, Your Honor? What was their negligence? In this context, what we pled and what we allege is the negligence is the failure to monitor and study the drug lindonate sodium. And as we discussed just a moment ago, the failure to remove the drug from the market based on what they knew or should have known about its risks. Well, what could the study have told them that would have been helpful because they couldn't change the active ingredients and they couldn't change the labeling. So what could they do? Suppose they said, boy, this drug is a disaster. America's making. They could refuse to sell it, of course, but they could just not manufacture it. But the Supreme Court said they could manufacture it. Well, again, but that's in the context of the strict liability claims, not the negligence claims. What would the Supreme Court say? Well, it can't be strictly liable if you continue to sell it, but you can be liable for negligence. Do you think they would really say that? I believe that's not addressed in Bartlett. And so I hate to hypothesize as to what they would say, but I know that they in Bartlett have not addressed that issue. That's, that's what I'm putting before the court, but that issue has not been addressed today. Well, I think if we construe the Supreme Court opinion like that, we'll become famous. That's another issue. We're supposed to follow what they say. I ran a word search on your principal brief, your original brief. I didn't see the word negligence appear at all, other than to say that you asserted a negligence claim originally, but nowhere does it appear in the argument section or the summary of argument. And again, what I was saying in that context was I believe much of the discussion within the brief is a discussion of design defect claims generally. And some of it is specific to the risk utility claims, but I think that the overarching discussion is a design defect claims generally. And I refer the court back to at the district court level that we obviously put that before the court, those claims as well. Well, before I let you go, then I got to just ask you quickly about the way this is framed because it, count nine of your complaint says generic defendants, strict liability, design defect. The only negligence claim that I can see in here is the negligence claim that's count 11. And it just says negligence. It doesn't say design defect or anything. So the only thing labeled design defect is the strict liability claim. How is a district court to know, or how are we to know that design defect encompasses a negligence theory when the complaint itself labels the counts design defects, strict liability, but negligence, no mention of design defect. Well, I think we put the district court on notice of that issue by specifically arguing that within the opposition brief before the district court, the negligence aspects are addressed. I believe it's in a footnote there where we specifically lay out the negligence concepts for design defect that I've just reiterated to the court here today.  Thank you, Mr. Vogel. We'll have you back on rebuttal. Thank you. Mr. Lefkowitz. May it please the court. Good morning, your honors. I want to just make an observation. I don't think I could have characterized it any more clearly than you did, your honor. There are only. Just asking questions. Well, you were reading from my outline, which basically says there are only three conceivable things the drug company can do. It can change the design of the drug. And Bartlett says you can't change the design. Bartlett was very clear. It then says you can't, you could possibly change the warning. That's another thing a drug company can do. And in fact, in some states, many states that have comment K, basically what warnings are is a second bite at the apple. Even if you can't change the design, maybe you could give a different warning. And of course, both Mensing and Bartlett say you can't do that. And then of course you have what Bartlett says, which Mensing had not gotten to explicitly, which is stop selling is no end, no answer to the question of impossibility preemption. So those are the only three things, whether it's negligence, strict liability, consumer expectations. Those are only, those are the only three conceivable things a drug company can do. And all three of them are squarely addressed. Now, as to the, let me ask, let me ask a question about how, how to deal with these arguments, because one of the complaints made by the plaintiffs here is that it's, it's not right to make broad sweeping statements like that, that this is, this is state law specific, that it doesn't lend itself to generalized treatment. And it was wrong to deal with this without analyzing the various pertinent state laws. And in fact, you know, they didn't say this, but it's the case that this Supreme Court goes on at length looking at New Hampshire law and Bartlett and at length looking at the state law. That's an issue in Mensing. Why is it wrong for them to be distressed at how they got bounced on the pleadings? Because your honor, if you look at any of the conceivable theories, and I'm not even addressing the fact that as you pointed out, the negligent design is not only not pled in their complaint, but it's not referenced in their opening brief. So leaving aside the waiver point, the negligent design series, which they, they cite in various cases, they all hinge on the, on the availability of an alternative design. And of course, what Bartlett made clear, obviously looking at New Hampshire law, because that's the law that was addressed in the case there, but they said there is no availability to change the design. So no matter what state law you're looking at, one of the things that state law would potentially be saying your duty would be, would be to change the design, the molecule, the molecular structure of a drug. And of course, we know that you can't do that without violating federal law. The other thing that states might permit you to do, many states do, is they say, well, we know drugs can be dangerous. Indeed, drugs are inherently dangerous, and therefore you can warn more appropriately. And that would make the judge, the drug safer. And if you didn't have a different warning, maybe it wouldn't be safer. But of course, Mensing and Bartlett make clear that it's a violation of federal law for a generic drug company to change the label. And that's why. What is the label? When you buy, you go to a drug store and you pick up a prescription. There's a label on the little bottle, but there's also a big long paper that comes with it in the bag. Is that the label? Well, actually the warnings are the, there is a whole elaborate set of warnings and labeling requirements, which are in fact intended under federal law to be warnings to the physician. Because of course, the drug company is actually warning the physician. That's the concept of learned intermediary. And they are very specifically prescribed. They have a lot of different sections, contraindications, warnings, dosage, and the like. And that is the warnings that are provided with drugs. And what federal law. Is that the label? Well, what does the word label mean? That's what I mean. I think label is often used to refer to all of the warnings provided in the packet insert. Yeah, when you read it, you'd never take the drug. Well. I get done. If you see it on television, they tell you for three seconds what it does for you. Then they tell you all the things that it will also do. I understand. I think that's really. It's good for your life. That's why doctors have to prescribe prescription drugs. People, you and I can't just go to a pharmacy and say, I'd like a prescription drug. A doctor has to prescribe it. But the key point is. Is there an avenue? Is there one avenue left to a plaintiff here? I mean, the Supreme Court in footnote four in Bartlett is it pains to say, we're not talking about misbranding here. You know, if the parties in the government they know had agreed that misbranding is when there's a quote, when liability is based on new and scientifically significant information that was not before the FDA, unquote. So if there was. Is there a way for a plaintiff to say, no, I still have a live cause action here. It wasn't foreclosed to me by Bartlett, and I ought to be able to plead it. There is certainly nothing in this case based on what's been pled or briefed to this court that would leave that open. I would say also, Your Honor, that the Supreme Court in that footnote did not actually in any way say that that would be a viable cause. It's specifically reserved because the government had articulated that there might be some conceivable cause of action in a situation that it acknowledged it doesn't know exists anywhere in the country. I'll also point out that the government made that very misbranding argument in the mensing case when it was not on our side, when it actually came in on the other side, and it tried to argue that Ms. Mensing and Ms. DeMahie's claims could potentially be viable as misbranding claims, and the court actually rejected it. So I think in Bartlett, all that footnote is saying is the government has addressed a hypothetical issue. Both parties have told us you don't need to address it here in this case, and so we are not addressing it. I think it would certainly be a mistake in this case for this court to suggest that those claims are in fact viable, when the court has not said that. The court simply said it reserved. We could leave for another day, and certainly another case, whether or not there is a credible theory there. I gather that the assumption in this case is that the generic manufacturers, in fact, followed the same method of manufacturing the drug as the brand, because I guess the plaintiff could allege that the generic manufacturer did not follow the brand's directions in building it. They didn't make it the same. Well, they could. They could potentially argue that they didn't make it the same because they put some other ingredient in it. That would really be a manufacturing defect claim, which is, of course, not raised at all in this case. That would be a different type of claim. You often read, if you read medical things, that some people claim that the generic drugs don't work as well. You read that. Other people say they do. But in theory, they should work exactly the same. As a matter of federal law, you're right. What the FDA is representing in its certification is that these are bioequivalent, and they will work in the same way on the human body therapeutically. Obviously, what you're positing is a case where potentially some drug company puts in different ingredients and, of course, therefore is not necessarily complying with the federal requirement to be bioequivalent. That's not at issue here. What's at issue here, and I just want to maybe sum up by giving the court the context for this case. This was a case where the plaintiff brought a variety of causes of action, the traditional failure-to-warrant cause of action, the risk-utility-based design defect action, breach of warranty and the like, and the trial court dismissed all of them under Mensa. And then, as the plaintiff was appealing, the First Circuit came down with a decision in Bartlett saying, notwithstanding Mensa, in a design defect case, which we think Mensa didn't address, there is an answer to preemption, which is stop selling. So the plaintiffs filed an appeal, and they made it clear they were appealing on the design defect claim, the risk-utility claim, and they relied on Bartlett because Bartlett, at the time, was good law. And that's the only argument they really put forward. You say they waived that? Well, I think they clearly waived, in a technical sense, their argument about stop selling with respect to design defect. They were arguing it with respect below to stop selling with respect to failure-to-warrant. Then, on appeal, in light of Bartlett, they came up with a new argument that they hadn't raised below. But even that new argument is foreclosed by Bartlett because, of course, Bartlett was reversed. And so, as Judge Jordan, as you articulated at the very beginning, there are only three things available to a drug company. It can change the design, whether it's risk-utility or consumer expectations, it can change the design, but, of course, federal law says you're not allowed to. It could put a different warning on. That might change the consumer's expectation of what the drug is supposed to do, but federal law prevents that. And the last option, which Bartlett squarely foreclosed and, indeed, called incoherent and incompatible with our preemption jurisprudence, is to say, well, if you can't change this and you can't change that, you can be held liable unless you take it off the market. Well, why do you think, Mr. Lefkowitz, the Court stated the holding in Bartlett in conditional terms the way it did? It said it in the, as your opposing counsel points out, it notes it in terms of claims that, quote, turn on the adequacy of a drug's warnings, close quote. It could have just said state-law design defect claims are preempted. It didn't. It said state-law design defect claims that turn on the adequacy of a drug's warnings are preempted. If they'd meant to shut it down altogether, why put the qualifier? I think if you look earlier in the opinion, the Court was very clear. That is earlier. Well, I'm looking at 24, well, I'm looking right at 2475 where the Court said in the present case, however, redesign was not possible. And then in the next paragraph, given the impossibility of redesigning Solondak, then the Court goes on and recognizes that because in New Hampshire you also have this safety valve of warnings, it then goes on and says given the impossibility of redesigning Solondak, the only way for Mutual to ameliorate the drug's risk utility profile and therefore escape liability was to strengthen the presence and efficacy of the warning. So it addressed both very, very clearly. I understand. Yeah, I read the parts you read too, but I'm still wondering why they felt the need to say claims that turn on the adequacy of the drug's warnings if it really doesn't matter whether we're talking about the drug's warnings. If it's designed straight up, you're still out of the box. Maybe, you know, it's hard to hazard a guess. It is possible that, you know, the fact of the matter is that in a, with a branded company, you might have a different situation because there are warning claims that are permitted under Wyeth. But in a generic drug company, you don't have that option. So therefore, whether the warning is an issue or not, whether the warning turns an issue or not, it's still preempted. The design of the drug, a single molecule drug, cannot be changed without violation. The Pennsylvania Superior Court in the Reglan litigation case was not persuaded that Mensing and Bartlett preempted claims under Pennsylvania law. Does that suggest that what we should be doing here is remanding and asking the district judge to do a state-by-state analysis of the law for preemption purposes? No, Your Honor, and I think just very recently the Sixth Circuit in the Strayhorn case gave a very clear explanation of how the Pennsylvania Superior Court simply got that wrong. That matter is now on appeal. We've asked the Pennsylvania Supreme Court to review that decision. Again, as the Mensing, as the Bartlett case said, it rejected, I believe in footnote five, as semantics, the idea that state duties can be rearranged simply to frame them as a duty to stop selling. Whatever the duty is, as Judge Jordan began the argument today with, whatever the duty is, however you describe it, there are still only three things available to a drug company. And respectfully, I think the Superior Court just completely missed that one. All right. Thank you very much, Mr. Lefkowitz. Thank you very much, Your Honor. Just briefly, Your Honors, I wanted to address a couple of points. One is exactly what the Court has stated here, which is Bartlett, as written, is a very narrowly drafted opinion. And in looking back at the Reglan case, which was just discussed. It's narrow in that one phrase, but speak to, rebut, if you would, Mr. Lefkowitz's point that no matter how they said it in that one sentence, the reasoning of it, the reasoning of it, embodies design issues apart from warning labels. The reasoning of Bartlett specifically applies to those states that apply an affirmative duty, like New Hampshire did, to modify the warnings or the design. And as I stated in my initial argument, there are states that don't oppose those affirmative duties. And that's what we're asking to be examined here, are those states. We've got 28 different states' laws in play with this case. Even if the state doesn't impose it by statute as an affirmative duty, but somehow through a negligence regime imposes a duty, some kind of a duty, that duty would be framed how? Get me out of the three boxes that we've been talking about. A duty to change the label, to change the design, or to get it off the market. What other duty could there, what other thing could there be at the end of this analysis? It is often framed as a duty to compensate those injured by a defectively designed product. And so it doesn't encompass any of the other three duties that have been discussed in this argument. I thought that when you comply with a duty, so you don't have to compensate, then the duty isn't the compensation, it's the obligation to do something so there isn't any compensation. And again, going back to the negligence claim which I discussed before, that very duty is to study and analyze your drug so that you know enough about it to know whether you should be selling it. Well, as soon as you say you should be selling it, that's just a different way of saying you should stop selling it, right? But again, that was addressed in a strict liability context, which I believe is the opposite sort of analysis and argument as what would apply in a negligence concept. Aren't you arguing sort of Justice Breyer's point from Bartlett, which is in a dissent? I mean, his, some of what he says seems to imply, if it doesn't say it directly, that it may not be impossible because you can so kind of pay the freight in the state by paying damages. And the majority rejects that and says that's not part of, that's not, that would render conflict analysis almost meaningless if you said, oh, you can pay torque damages as the price to obey federal law. But I believe that that analysis likely has merit when you're talking about a negligence-based claim when you're looking at the very conduct of the manufacturer, whereas in a strict liability claim, that's not always the analysis. How can the negligence title on it help you? Because, again, it's the very conduct and the reasonableness of the conduct, and here the conduct being analyzing, studying, and deciding whether you should sell your drug, that is the very core issue that you're deciding, that a jury would be deciding. Okay. Thank you very much, Mr. Vogel. Thank you, Mr. Lefkowitz. I'll look forward. Now, why don't we, is it, I know we're right on the front of the holiday, so maybe it's appropriate to give a little more time, but could we reasonably expect you folks to get us a 28-J letter in the first full week of the new year? Is that doable, Mr. Vogel or Mr. Lefkowitz? Yes, Your Honor. It is one clarification. I believe, unless I'm wrong, the 28-J letter has a limit of 350 words. I wonder if the court could give us, since we may have to explore some cases and some rules, maybe a 10-page maximum? Well, you know, I don't mind giving you each 10 pages, but I don't see this as much more than, hey, there really is somebody left in the case, and hopefully that can be done in 350 words or less. But, you know, if you think, we just want an answer to the question. Do we have a final appealable order or don't we? Because at this juncture, it looks a lot like we don't. Absolutely not. If, per chance, you conclude that the order could be made final, not made appealable, I'm sure you'll tell us that in the letter if, in fact, that's what you're seeking to do. Right. Yes, thank you, Judge Greenberg. If you can fix a jurisdictional problem and have it agreed on a way to try to fix it, and you've approached the district court about fixing it, we'd like to know that as well, clearly. Absolutely, Your Honor. All right. Thank you. Thank you. Appreciate counsel's time. We'll call the next case.